# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER CUMMINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17CV28 RLW |
| | ) | |
| NANCY BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI of the Act. For the reasons set forth below, the Court affirms the decision of the Commissioner.

## I. Procedural History

Plaintiff protectively filed an application for DIB on May 15, 2014 and an application for SSI on May 12, 2014. (Tr. 12, 181-94) Plaintiff alleged disability beginning February 16, 2014 due to back pain (DDD, lumbarization, bulging disc); anxiety/depression; and hepatitis C virus. (Tr. 87, 117) Plaintiff's claims were denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 87-114, 117-25) On January 14, 2016, Plaintiff testified at a hearing before the ALJ. (Tr. 32-63) In a decision dated February 16, 2016, the ALJ determined that Plaintiff had not been under a disability from February 16, 2014 through the date of the decision. (Tr. 12-26) On March 2, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the January 14, 2016 hearing, Plaintiff appeared with counsel. Plaintiff testified that he did not complete high school or obtain a GED. Plaintiff previously worked for Gateway Refrigeration as a forklift operator. He left that job after a doctor advised Plaintiff to find a different job because he was operating a stand-up forklift on concrete. Plaintiff began another job at Hodie Farms as an equipment operator but was unable to perform his job due to back pain. Plaintiff quit his job after two months. Prior to his job with Gateway Refrigeration Plaintiff worked for RC Storm Water as an operator of either an excavator, a dozer, or a skid loader. All his jobs required long periods of sitting except his job as a stand-up forklifter. (Tr. 38-40, 44-45)

Plaintiff testified that he was unable to work due to a protruding disc in his lower back with degenerative disease, nerve damage in his left leg, and nerve pain in his right leg. He could only sit for about 30 minutes before needing to stand for 30 to 45 minutes. He would lie down for a few hours and then repeat the cycle. Plaintiff took Alprazolam for anxiety, Temazepam for sleep problems, and Brintellix for depression. He stated that he did not need his sleep medicine every day because he was sleeping better. He did not take pain medication because it did not work and made his stomach upset. (Tr. 41-43, 48)

Plaintiff further stated that the pain was in his lower back, mostly in his pelvis and sciatic regions. The pain traveled to his legs if he sat for over 40 minutes. Plaintiff described the pain as a bad aching which turned to stabbing. Plaintiff testified that he could cook and do laundry, but he was unable to stand over the sink to wash dishes. He did not have difficulty bending, crouching, or stooping unless it was done repetitively. His pain increased with repetitive motions and wet weather. Plaintiff used ice and sat in his jet tub to relieve pain. He testified that medication, injections, a TENS unit, and physical therapy did not help his pain. (Tr. 45-48)

2

Plaintiff tried to avoid lifting anything heavy but believed he could lift a gallon of milk in each hand. He stated he typically was up for about four hours and then needed to take a nap. He experienced good days and bad days. On a bad day, Plaintiff had to stay in bed all day. If he lifted or turned the wrong way he was instantly in pain. Plaintiff was unable to do any chores or run errands. However, he was able to get up and move around the following day. Plaintiff stated that he had these bad days once every other week. (Tr. 48-50)

With respect to his anxiety and depression, Plaintiff testified that his anxiety caused chest pain and sweating. His depression caused him to feel hopeless and not want to do anything. He also had problems with focus and concentration. Plaintiff stated that his memory of recent events was poor, and he had a few problems finishing projects. He was able to get along with anybody, and did not let his mood or pain affect that. Plaintiff's psychiatrist, Chelsea Everley, recently moved to Illinois, but she had treated Plaintiff for four years. Plaintiff did not experience side effects from his mental health medications. (Tr. 50-52)

Plaintiff stated that he lived in a house with his wife and nine-year-old daughter. Plaintiff sometimes drove his daughter to school. His wife worked from home and also provided transportation to school. During a typical day, Plaintiff watched TV. He did not use a computer because it was too difficult to figure out. He prepared meals for his family and drove three to four times a week to take his daughter to school. He had no difficulty with driving. (Tr. 52-54)

A vocational expert ("VE") also testified at the hearing. The VE classified Plaintiff's past work as an industrial truck operator and heavy equipment operator, with medium exertional level, light as actually performed by Plaintiff. In addition, Plaintiff worked as a short order cook at a light exertional level. (Tr. 54-57)

3

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work history with a residual functional capacity ("RFC") to perform work at a light exertional level. The person should never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or hazardous work environments. He may occasionally climb stairs or ramps and occasionally stoop, kneel, crouch, or crawl. The individual should avoid concentrated exposure to extreme cold and humidity. Further, he was limited to remembering and carrying out simple, routine tasks and making simple work-related decisions. He was unable to perform production rate pace types of tasks but would meet all end of day goals. In addition, the person would be off task 10 percent of the workday. Given this hypothetical, the VE testified that the individual was unable to perform Plaintiff's past work. However, he could perform work as a mail clerk, cafeteria attendant, and cashier II. (Tr. 57-59)

If the ALJ added the limitation that the individual required a sit/stand option to shift positions hourly, the cashier II position would be eliminated. Further, if the hypothetical removed the sit/stand option and changed the light exertional level to sedentary, the individual could perform work as a call-out operator, document preparer, and address clerk. The ALJ also asked whether any of the sedentary or light exertional level jobs were excluded by a restriction to avoid frequent repetitive twisting. The VE responded that the cafeteria attendant would be ruled out. However, the person could work as an office helper. The VE testified that her answers were consistent with the Dictionary of Occupational Titles ("DOT") and were also based on her years of education and research in job placement. (Tr. 59-62)

Plaintiff's attorney also questioned the VE and asked whether an individual that had to miss work two or more days per month due to his impairments would be able to work. The VE responded that no work would be available. Further, if the individual required additional breaks

4

beyond those customarily allowed, which resulted in being off-task 20 percent of the time, such restrictions would rule out work altogether. At the end of the hearing, the ALJ noted that she would hold the record open to wait for a doctor's statement. (Tr. 62-63)

In a Function Report – Adult dated June 3, 2014, Plaintiff's wife Abby Cummings completed the form on behalf of Plaintiff, who stated his activities depended on his level of pain and/or anxiety. Plaintiff went for walks and tried to exercise to relieve pain, but he spent most days in bed for at least half the day. Plaintiff was able to take care of his daughter and the family pets. He experienced problems sleeping due to pain and anxiety. Plaintiff needed to be reminded to take his medication. He prepared meals a few times a month and was able to make general home repairs when his back was not bothering him. His wife or brother helped with heavy lifting. Plaintiff stated that he could not bend over to do laundry or ride the lawn mower due to back pain. Plaintiff went outside every day. He was able to shop for groceries and household items a few times a month. He reported that he could not handle money because he did not have the skills to sit down and concentrate. Plaintiff enjoyed movies, TV, going to garage sales, and gardening. He spent time with friends and family monthly. Plaintiff stated that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, remember, complete tasks, concentrate, and understand. On days when his back pain was not severe, Plaintiff could walk one mile, rest for a few minutes, and walk back. His level of attention depended on his anxiety and pain levels. He could not read or write well, and he stated that he followed spoken instructions okay, depending on his level of pain and anxiety. Plaintiff did not handle stress well, stating that he suffered from panic attacks and depression most of his life. (Tr. 248-55)

Plaintiff's wife also completed a Function Report Adult – Third Party. She stated that she needed to help Plaintiff with caring for the pets and with taking off boots and bathing. Her report essentially mirrored Plaintiff's function report. (Tr. 256-63)

### III. Medical Evidence

On March 18, 2013, Plaintiff saw Chelsea Everley, PMHNP-BC, a psychiatric mental health practitioner, for complaints of anxiety and depression. Ms. Everley assessed mood disorder, NOS, and generalized anxiety disorder. She increased Plaintiff's Prozac dosage and started Plaintiff on Xanax, Buspar, and Restoril. (Tr. 347) Plaintiff's mood was improved with Prozac when he returned on April 15, 2013. Plaintiff reported decreased motivation but noted that his sleep improved with Restoril. Ms. Everley increased his Prozac dosage and refilled his other medications. On July 15, 2013, Plaintiff's mood was better. He had more energy with good motivation and sleep. (Tr. 346)

On November 18, 2013, Plaintiff reported decreased mood and increased stress. He was not getting out of bed for three days at a time. His appetite was low, and he had lost 20 pounds. Ms. Everley discontinued Prozac and prescribed Viibryd. (Tr. 345) Plaintiff returned to Ms. Everley on December 4, 2013. He reported feeling better after 3 days on the new medication. Plaintiff complained of shoulder and back pain. Ms. Everley discontinued Buspar and continued Plaintiff's other medications. (Tr. 344) On January 16, 2014, Plaintiff complained that his mind was going all over. He also mentioned that a pinched nerve in his left shoulder was bothering him again, and he reported chronic pain from a bulging disc in his back. He continued to operate heavy machinery and was concerned he would not be able to work again. Ms. Everley continued Plaintiff's medications. (Tr. 343)

6

Plaintiff saw gastroenterologist Layla Hajjafar, M.D., on January 22, 2014. Plaintiff presented for evaluation of hepatitis C, for which he had never received treatment. Dr. Hajjafar noted that Plaintiff's liver function appeared normal, and he would not be eligible for any interferon regimen due to his psychiatric history. (Tr. 303-04)

On February 23, 2014, Plaintiff presented to the ER for complaints of back and left shoulder pain. Plaintiff stated that his back pain was ongoing but had gradually worsened. He described his low back pain as a moderate, shooting pain, which was worse at night. He also reported abdominal pain and sciatica. Musculoskeletal exam showed decreased range of motion, tenderness, and pain in Plaintiff's left shoulder. He demonstrated tenderness, bony tenderness, and pain in his low back. Plaintiff's mood, memory, affect, and judgment were normal. The attending physician prescribed Prednisone and Vicoprofen and instructed Plaintiff to call his doctor about an MRI of the lumbar spine. The physician believed the shoulder pain was a result of a strain. Plaintiff received a note to be off work for 3 days. Final diagnoses were chronic back pain and left shoulder pain. (Tr. 317-22)

Plaintiff saw Frank Tull, IV, M.D., on February 26, 2014 with complaints of left shoulder pain with activity. Plaintiff reported occasional throbbing and neck pain, with no numbness, tingling, or weakness. Physical exam revealed no acute distress with some tenderness and mild swelling in his AC joint. He had full passive range of motion with minimal impingement signs. X-rays showed some AC joint arthrosis and a normal glenohumeral joint. Dr. Tull assessed acromioclavicular joint arthrosis, left shoulder, symptomatic. Dr. Tull administered a steroid injection in Plaintiff's AC joint. (Tr. 335-36)

On March 4, 2014, Plaintiff saw Timothy Graven, D.O., for complaints of low back pain. Plaintiff stated that past epidural injections provided some relief. He took Aleve/Naprosyn on an

7

as needed basis. Physical exam was normal. Dr. Graven ordered an MRI and advised Plaintiff to continue taking Naprosyn twice daily. (Tr. 337) Plaintiff returned to Dr. Graven on March 11, 2014. An MRI revealed disc bulging at L5 and S1, more to the left than right. Dr. Graven also noted some foraminal encroachment at L4-5. Plaintiff reported doing better due to decreased activity. They discussed finding a less strenuous job. The physical exam was unremarkable. (Tr. 339)

On May 15, 2014, Plaintiff reported having a good mood despite his pain, but his sleep was variable. Ms. Everley advised Plaintiff to continue his medications and return in 3-4 months. (Tr. 342) On June 12, 2014, Ms. Everley completed a Medical Source Statement – Mental ("MSSM"). She listed Plaintiff's diagnoses as general anxiety disorder and mood disorder, NOS. She opined that Plaintiff's medications caused drowsiness and lack of focus. His conditions caused him to have bad days which would cause him to miss work 4 days a month and be off task 25% or more. Ms. Everley further opined that Plaintiff had marked limitations in his ability to understand and remember detailed instructions and carry out detailed instructions. He was moderately limited in several areas of sustained concentration and persistence, social interaction, and adaptation. Ms. Everley based her opinions on Plaintiff's medical history, clinical findings, diagnosis, and prescribed treatment with response and prognosis. Ms. Everley excluded from consideration all limitations resulting from conscious malingering. (Tr. 348-49)

When Plaintiff returned to Ms. Everley on August 20, 2014, he reported that he no longer had insurance but applied for Medicaid. He recently experienced a panic attack. Ms. Everley advised Plaintiff to continue his medications. (Tr. 446)

On October 26, 2014, Plaintiff presented to the ER with complaints of low back pain radiating into right leg to foot. Plaintiff was diagnosed with back pain and given Naprosyn and a

8

Medrol Dosepack. Plaintiff returned two days later complaining of nausea and vomiting after he abruptly stopped taking Percocet. Plaintiff reported no pain. His mood was anxious. He was given IV fluids and discharged the same day after improvement. (Tr. 404-05, 422-23)

Plaintiff saw Christina Goldstein, M.D., on November 20, 2014 for treatment at a spinal clinic due to his low back pain. Plaintiff reported that his pain was at a constant 6/10 in severity and was aggravated by riding for long periods in cars, lifting, and twisting. Forward flexing was uncomfortable. Plaintiff also complained of radiating pain into his leg, some groin discomfort, and numbness in his toes. Plaintiff was in no distress during the exam. Dr. Goldstein noted mild loss of lordosis with some tenderness to palpation over the right lumbosacral paraspinal muscles. Plaintiff had well preserved range of motion with pain on extension with a slow gait and left foot drag. Plaintiff was unable to perform tandem gait or heel and toe. X-rays and an MRI of the lumbar spine revealed mild spondylosis at L4-5 and L5-S1, with some loss of disc height and disc desiccation. However, there was no spondylolisthesis or nerve root impingement. Dr. Goldstein opined that surgical intervention was not necessary. She recommended strengthening exercises and referred Plaintiff to a neurologist. (Tr. 397-401)

On December 8, 2014, Plaintiff saw Thomas Spencer, Psy.D., for a psychological evaluation to determine Medicaid eligibility. Plaintiff complained of depression and anxiety. Plaintiff reported doing laundry and dishes, taking his daughter to and from school, preparing meals, watching TV, and resting throughout the day. Dr. Spencer noted that Plaintiff's appearance/behavior and speech were normal. His mood was stable and affect was calm. Plaintiff's flow of thought was relevant and his insight/judgment was fairly intact. He had some difficulty with recent memory and concentration. Dr. Spencer assessed generalized anxiety disorder; polysubstance dependence in sustained remission; cannabis abuse versus dependence;

occupational, educational, and health care access problems; and a GAF of 55-60. Dr. Spencer opined that Plaintiff had a mental illness which limited his ability to engage in employment, the duration of which could exceed 12 months. However, with continued sobriety and medication treatment and compliance, Plaintiff's prognosis would likely improve. (Tr. 434-38)

Plaintiff was treated by D. Christopher Main, D.O., on December 17, 2014 for complaints of low back pain. Plaintiff was seeking disability and medical assistance. Plaintiff's gait, heel/toe walk, and tandem walk were normal. X-rays revealed mild disc degeneration at L4-5 and L-5-S1. Dr. Main assessed lumbar degenerative disc disease. Dr. Main also noted that based on the physical exam, there were no functional deficits preventing Plaintiff from gainful employment. (Tr. 439-41)

On February 17, 2015, Plaintiff saw Khulood T. Ahmed, M.D., to establish care for Plaintiff's hepatitis C. Dr. Ahmed noted that Plaintiff had no features of advanced liver disease. Plaintiff seemed to be a candidate for hepatitis C treatment. (Tr. 390-93) An ultrasound performed on February 19, 2015 revealed mild hepatosplenomegaly and a small right renal simple cyst. (Tr. 389)

Plaintiff was seen by Miguel Chuquilin Arista, M.D., on March 4, 2015 for evaluation of low back pain and bilateral lower extremity pain. On examination, Plaintiff was cooperative and in no apparent distress. He had normal muscle tone and normal muscle strength in the upper and lower extremities except decreased activation left tibialis anterior. His gait was normal. Dr. Arista opined that Plaintiff's symptoms were secondary to neuropathic pain, which was possibly for radiculopathy. Dr. Arista ordered EMG and nerve conduction studies and prescribed gabapentin for pain and Flexeril for muscle relaxation. (Tr. 383-86) During a follow-up appointment with Dr. Arista, Plaintiff stated that his symptoms were unchanged. Dr. Arista

noted that the EMG and nerve conduction study showed mild sensory peripheral neuropathy with no evidence of radiculopathy. Dr. Arista prescribed a lidocaine patch. Although Plaintiff requested Percocet, Dr. Arista did not prescribe opiates for chronic pain. (Tr. 373-75)

Plaintiff returned to Dr. Ahmed on April 30, 2015 to follow-up with his hepatitis C. Dr. Ahmed planned to obtain Fibrosure and HCV viral load, as well as begin hepatitis B immunization. (Tr. 363-66) That same day Plaintiff was examined by Mark W. Drymalski, M.D., with the Spine Clinic. On examination, Dr. Drymalski noted full range of motion in the lumbar spine, both hips, both knees, and both ankles. There was no significant tenderness to palpation over the lower lumbar paraspinals or SI joints. Lumbar pain improved with flexion and was exacerbated with extension. Facet loading was positive bilaterally at the lumbosacral junction, with the left worse than right. Dr. Drymalski assessed chronic low back pain which was secondary to lumbar degenerative disc disease at L5-/1 with a small disc protrusion and lower lumbar spondylosis, left worse than right. He also assessed a history of hepatitis C and alcoholism. Dr. Drymalski opined that Plaintiff's neuropathy could be alcoholism induced. He saw multiple red flags for chronic opioid use. Dr. Drymalski also diagnosed left hip pain caused by probable hip impingement. Plaintiff was not interested in medication options other than opioids. Both Dr. Drymalski and Plaintiff's wife expressed concerns about Plaintiff's opioid use. Dr. Drymalski recommended treatment with a physician to explore non-opioid options and ordered an x-ray to evaluate Plaintiff's left hip pain. (Tr. 369-72) The x-ray performed on May 12, 2015 revealed minimal hip joint space narrowing. (Tr. 362)

Plaintiff returned to Dr. Drymalski on May 13, 2015 for a left L3, L4, L5 medial branch block with lidocaine. (Tr. 360) On May 15, 2015, Plaintiff saw Ms. Everley and complained of numbness and pain in his spine. He stated the planned to get his nerves cauterized. He denied

11

taking any opioid medication. (Tr. 445) Plaintiff received a second medial branch block on May 26, 2015 and a radiofrequency ablation on June 9, 2015. (Tr. 358, 355-56)

On September 29, 2015, Plaintiff returned to Ms. Everley and complained of continued back pain. Plaintiff's anxiety was 0/10, but his depression was 8/10. Plaintiff was depressed about not being able to work. He wanted to get a green house and grow vegetables. Ms. Everley continued Plaintiff's medications and added Lyrica. (Tr. 444)

Plaintiff saw Dr. Drymalski for a follow-up visit on October 16, 2015. Plaintiff reported that he was unable to tolerate Lyrica. The ablation only helped for one month, and he had severe weakness in his legs for about a day, which had resolved. Plaintiff rated his low back pain as 7/10. On examination, Dr. Drymalski noted decreased range of motion with flexion and extension. Plaintiff had full range of motion in both hips and both ankles. There was tenderness to palpation over the lower lumbar facets bilaterally. Dr. Drymalski assessed chronic low back pain, likely multifactorial and secondary to lumbar degenerative disc disease. He did not think further procedures would provide much benefit. Dr. Drymalski opined that Plaintiff had discogenic pain primarily. He stressed the importance of tobacco cessation and gave Plaintiff additional exercises for his back, which he was to do on a daily basis. (Tr. 351-54)

Dr. Drymalski completed a Medical Source Statement – Physical ("MSSP") on January 24, 2016. Plaintiff's diagnoses included chronic low back pain, peripheral neuropathy, left hip impingement, low lumbar spondylosis, hepatitis C, lumbar degenerative disc disease, and left hip pain. His symptoms included pain, fatigue, left ankle weakness, and bilateral leg pain. Dr. Drymalski opined that Plaintiff could lift and carry up to 20 pounds constantly and up to 50 pounds occasionally; frequently balance and crawl; occasionally twist, stoop, crouch, and climb; sit or stand for 30-45 minutes at a time before needing to change positions; and sit and stand at

12

least 6 hours in an 8-hour workday. Plaintiff needed to shift positions at will. He did not need to take unscheduled breaks, use a cane, or elevate legs. Dr. Drymalski further opined that Plaintiff would be off-task 10% of the day and would miss work 2 days per month due to his condition. He did not know whether Plaintiff could tolerate work stress and noted that was a better question for a psychiatrist. (Tr. 447-49)

## IV. The ALJ's Determination

In the decision dated February 16, 2016, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019. He had not engaged in substantial gainful employment since February 16, 2014, his alleged onset date. The ALJ determined that Plaintiff had severe impairments which included degenerative disc disease, generalized anxiety disorder, and peripheral neuropathy. However, he did not have an impairment or combination thereof which met or medially equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-17)

After careful consideration of the entire record, the ALJ found that Plaintiff had the RFC to perform light work with additional nonexertional limitations. These limitations included never climbing ladders, ropes, or scaffolds; avoiding all exposure to unprotected heights or hazardous work environments; no more than occasionally climbing ramps or stairs; no more than occasionally stooping, kneeling, crouching, or crawling; avoiding concentrated exposure to extreme cold or humidity; remembering and carrying out only simple, routine tasks and making simple work-related decisions; never performing production-rate pace tasks but able to meet end of day goals; being off-task for up to ten percent of the workday; and alternating between sitting and standing positions hourly up to five minutes while remaining on task. The ALJ further found that Plaintiff was unable to perform his past relevant work. However, in light of his

13

younger age, limited education, work experience, and RFC, the ALJ found that jobs in significant numbers in the national economy existed which Plaintiff could perform. These jobs included mail clerk and cafeteria attendant. Therefore, the ALJ concluded that Plaintiff had not been under a disability from February 16, 2014 through the date of the decision and was not disabled. (Tr. 17-26)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the

14

zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to

plaintiff's complaints under the *Polaski[1]* factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In his brief in support of the Complaint, Plaintiff raises two arguments. First, Plaintiff asserts that substantial evidence does not support the RFC finding because the ALJ failed to include mental limitations assessed by Ms. Everley. Second, Plaintiff argues that substantial evidence does not support the RFC finding because the ALJ failed to properly evaluate the opinions of Plaintiff's treating physician, Dr. Drymalski. Defendant responds that the ALJ properly considered opinion evidence in determining Plaintiff's RFC and properly determined that Plaintiff's RFC allowed him to perform other work.

## A. The ALJ's Evaluation of Other Medical Source

Plaintiff argues that the ALJ improperly determined Plaintiff's RFC by failing to include all of the mental limitations set forth in Ms. Everley's MSSM. Specifically, Plaintiff contends that the ALJ failed to include moderate limitations in Plaintiff's ability to sustain concentration and persistence, ability to interact socially, and ability to adapt. In addition, Plaintiff argues that

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

16

the ALJ failed to consider Ms. Everley's opinion that Plaintiff would be off-task 25 percent of the day and would miss four days of work per month. Defendant asserts that the ALJ properly considered Ms. Everley's opinion and gave it moderate weight in determining Plaintiff's RFC.

RFC is defined as the most that a claimant can still do in a work setting despite that claimant's physical or mental limitations. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). Because "'[t]he ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC.'" *Martise*, 641 F.3d at 923 (quoting *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010)).

The record shows that the ALJ properly considered the medical evidence and based the RFC determination on all of the evidence contained in the record. "'Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20)). The ALJ found that Plaintiff had the RFC to perform light work with additional nonexertional limitations.

While Plaintiff argues that the ALJ should have either incorporated all the limitations set forth in Ms. Everley's MSSM or provided an explanation for their exclusion, the Court notes that Ms. Everley is not an acceptable medical source. "Nurse practitioners and therapists 'are specifically listed as 'other' medical sources who may present evidence of the severity of the

claimant's impairment and the effect of the impairments on the claimant's ability to work.'"

*Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (quoting *Lacroix v. Barnhart,* 465 F.3d 881,

887 (8th Cir. 2006) (citations omitted)). "Evidence provided by 'other sources' must be

considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is

inconsistent with the evidence in the record." *Id.; see also Raney v. Barnhart,* 396 F.3d 1007,

1010 (8th Cir. 2005) ("In determining what weight to give 'other medical evidence,' the ALJ has

more discretion and is permitted to consider any inconsistencies found within the record.").

Here, the ALJ did not disregard Ms. Everley's opinion as a Nurse Practitioner but gave

the opinion moderate weight. The ALJ noted that Ms. Everley was not an acceptable medical

source and that her pattern of treatment of Plaintiff was conservative, with a decrease in

treatment frequency. The ALJ further noted that the treatment notes did not support the most

restrictive limitations opined by Ms. Everley such as the need to miss 4 days of work per month

or be off-task 25 percent of the time, but reflected only minimal symptoms. (Tr. 23) The Court

finds that the ALJ properly discounted Ms. Everley's opinion in the MSSM as inconsistent with

her own treatment notes. *See Hanke v. Berryhill,* No. 4:17-CV-01323-AGF, 2018 WL 2335744,

at *4 (E.D. Mo. May 23, 2018) (finding the ALJ properly considered the opinion of the licensed

professional counselor and her questionnaire opining that the plaintiff could not meet

competitive work standards and properly discounted her opinion as inconsistent with her own

treatment notes and other medical evidence).

The ALJ instead found that the Plaintiff only experienced mild restrictions in activities

of daily living and in social functioning. The ALJ noted that Plaintiff was able to prepare meals,

perform general repairs, go outside, walk, drive a car, to shopping, count change, and watch TV.

Plaintiff also spent time with family and friends and reported no problems getting along with

others. With regard to concentration, persistence, or pace, the ALJ found Plaintiff had moderate difficulties. (Tr. 16, 21) The ALJ found Plaintiff's subjective complaints of disabling mental impairments were not consistent with the diagnostic testing, Plaintiff's treatment, mental examinations, or Plaintiff's activities. (Tr. 21, 24-25) The ALJ accounted for Plaintiff's credible subjective complaints of mental limitations and restricted Plaintiff to only simple, routine tasks and work-related decisions, no production-rate tasks, and being off-task for 10 percent of the day. (Tr. 17, 24-25) The Court finds that substantial evidence supports the RFC with respect to Plaintiff's mental impairments, and the ALJ did not err in discounting Ms. Everley's opinion. *Hanke*, 2018 WL 2335744, at \*4.

## B. The ALJ's Evaluation of Plaintiff's Treating Physician

Next, the Plaintiff asserts that the ALJ erred in failing to give controlling weight to the opinion of Dr. Drymalski, Plaintiff's treating physician. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at \*11 (D.S.D. Feb.

19

23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, the record shows that the ALJ thoroughly considered the medical records and gave proper weight to the medical opinion evidence. Specifically with regard to Dr. Drymalski, the ALJ gave the MSSP opinion moderate weight because it contained limitations not mentioned in the treatment notes and was not supported by objective testing. The ALJ noted that Dr. Drymalski's pattern of treatment was conservative, and the physical exams did not support the level of opined restrictions. (Tr. 22-23) In addition, the form completed by Dr. Drymalski consisted primarily of a "standardized, check-the-box form." (Tr. 23)

The record shows that Plaintiff was not interested in medication options suggested by Dr. Drymalski unless they were opioids. Dr. Drymalski refused to prescribe these due to red flags for chronic opioid use. (Tr. 19-20) While Plaintiff underwent steroid injections and an ablation, and exhibited some decreased range of motion and tenderness in the lumbar spine, physical exams also showed unremarkable gait, full extremity strength, no atrophy, and no significant neurological or musculoskeletal deficits. (Tr. 20, 353) "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) (citations omitted).

Further, the record shows that the ALJ did account for most of Dr. Drymalski's limitations in the MSSP by limiting Plaintiff to light exertional tasks with no climbing ladders, ropes, or scaffolds; avoiding all exposure to unprotected heights or hazardous work environments; no more than occasionally climbing ramps or stairs; no more than occasionally stooping, kneeling, crouching, or crawling. (Tr. 17, 448) In addition, the ALJ accounted for Dr.

Drymalski's opinion that Plaintiff should shift positions during the day and would be off-task for 10 percent of the workday. (Tr. 17, 448-49)

However, the Court finds that the ALJ properly discounted Dr. Drymalski's opinion that Plaintiff would need to miss work 2 days per month. As previously stated, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz*, 182 F. App'x at 626. Further, to the extent Dr. Drymalski's questionnaire relied on Plaintiff's subjective complaints and provided no further elaboration, the ALJ properly gave the opinion moderate weight. *See Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (discounting treating physicians' opinions where the form cited no clinical test results, treatment notes did not report significant limitations due to back pain, and the opinions were based on plaintiff's subjective complaints); *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) ("[A] conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'") (quoting *Wildman*, 596 F.3d at 964).

Further, the Court finds that other medical opinions in the record are inconsistent with Dr. Drymalski's opinion. As noted by the ALJ, test results showed only mild to moderate findings, and Plaintiff generally presented with normal gait, full motor strength, normal sensation, and no significant musculoskeletal or neurological deficits. (Tr. 18-19) The ALJ also noted that Plaintiff's self-reported daily activities were inconsistent with his allegations of disability. (Tr. 21) As stated above, Plaintiff reported preparing meals, performing home repairs, walking outside, driving, shopping, and watching television. Based on the inconsistencies in the record between Dr. Drymalski's opinion and his treatment records and other medical evidence, and inconsistencies in Plaintiff's testimony regarding his daily functioning, the Court finds that the

21

ALJ correctly found that Dr. Drymalski's MSSP was unsupported by the evidence as a whole and properly gave the opinion moderate weight. *See Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) ("Upon reviewing the entire record, we conclude that there is substantial evidence to support the ALJ's finding that certain opinions in the Medical Source Statement are inconsistent with [the treating physician's] own treatment notes and other relevant evidence."); *Martise*, 641 F.3d at 926 (finding the ALJ properly discounted the treating physician's MSS opinion where the ALJ properly performed an exhaustive analysis of the medical records and noted the inconsistencies in the record between the treating source's opinions and other substantial evidence). Thus, the Court finds that substantial evidence supports the ALJ's RFC finding and determination that Plaintiff was not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 10th day of September, 2018.

Ronnie L. White

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**